## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| MARK KALLING, on behalf of himself individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br>     v.<br><br>Netgain Technology, LLC,<br><br>          Defendant. | Case No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## <u>INTRODUCTION AND SUMMARY OF ACTION</u>

1.     Plaintiff Mark Kalling ("Kalling"), on behalf of himself and all others similarly situated, allege the following against Defendant Netgain Technologies, LLC ("Netgain").

2.     This class action is brought on behalf of patients whose sensitive personal information was stolen by cybercriminals in a cyber-attack that accessed patient data through Netgain's services on or around September 23, 2020 (the "Data Breach").

3.     The Data Breach affected at least 800,000 individuals from Netgain services.[1]

---

[1] Hannah Mitchell, *SAC Health System, CareSouth Carolina patients bring Netgain ransomware victims to 820,000: 7 hospitals, healthcare providers affected* (Last accessed: June 4, 2021) https://www.beckershospitalreview.com/cybersecurity/28-000-sac-health-system-patients-added-to-netgain-ransomware-victims-6-hospitals-healthcare-organizations-affected.html

4.      Netgain reported to Plaintiff information compromised in the Data Breach, which "included full or partial: first and last names, dates of birth, billing information, social security numbers, telephone numbers, mailing and billing addresses, email addresses, patient and record identifiers, information relating to [patient] treatment (including billing and diagnosis codes, and the dates and locations of [patient] treatment), information contained within [patient] state-issued photo identification (including biometric information such as [patient] height, weight, driver's license number, organ donor status, and appearance), and insurance cards containing [patient] name and/or beneficiary number." This information is collectively known as "personally identifiable information" or "PII".

5.      Plaintiff was not notified until February 24, 2021, five months after the first breach occurred, and exactly three months after Netgain discovered the breach.

6.      As a result of the Data Breach, Plaintiff has experienced various types of misuse of his PII, including unauthorized credit card charges across at least three separate credit cards, credit card fraud alerts, notification his social security number is on the dark web, a 100-point drop in credit score, a cancelled utility bill, and increase in spam and other suspicious events related to use of PII like social security number that Plaintiff had not publicly shared. As a result of the suspicious credit card activity, Plaintiff's credit card companies now marked him for targeted advertising to pay a monthly subscription fee for identity protection. Plaintiff has already incurred out of pocket costs for credit monitoring. Additionally, Plaintiff has lost time and productivity from taking time to mitigate actual and future consequences of the Data Breach to deal with the effects on

Plaintiff's credit cards, and effects of those credit cards on necessities like renting housing and paying utility bills. Plaintiff experienced stress, nuisance, and annoyance of dealing with issues resulting from the Data Breach.

7.    There has been no assurance or remedy offered from Netgain that all personal data or copies of data has been recovered or destroyed. Instead, Netgain paid ransomware attackers in exchange for a promise that cybercriminals would delete all data. Paying ransomware attackers for an attack only encourages future ransomware attacks.[2] Netgain's payment to attackers for a promise to delete data does not guarantee deletion of stolen data.

8.    Plaintiff had no understanding of Netgain's role in handling his PII at the time Plaintiff directly shared his PII with his healthcare provider, Nevada Orthopedic & Spine Center.

9.    Netgain, as a cybersecurity expert, knew and should have known how to prevent a common ransomware attack.

10.    If Plaintiff knew his PII would have been improperly handled, he would have sought health care elsewhere.

11.    Accordingly, Plaintiff asserts claims for violations of negligence, negligent misrepresentation, breach of contract, breach of implied contract, unjust

---

[2] Because of the common knowledge that paying ransomware attackers encourages data breaches, the U.S. Department of Treasury Office of Foreign Assets Control announced in October 2020 that paying cybercriminals after a ransomware attack is worth imposing sanctions.
https://home.treasury.gov/system/files/126/ofac_ransomware_advisory_10012020_1.pdf

enrichment/quasi-contract, breach of confidence, violation of Minnesota consumer protection statutes Minn. R. 325E.61 and Minn. R. 325D.44. Plaintiff seeks injunctive relief, monetary relief, stand all other relief as authorized in equity or by law.

## PARTIES

12.    Plaintiff Mark Kalling is a resident of Las Vegas, Nevada. Kalling received two surgeries from Nevada Orthopedic & Spine Center, a business associate of Netgain. Netgain exposed Kalling's private information as a result of Netgain's inadequate security choices. On February 24, 2021, Kalling received a notification letter stating Kalling's PII was stolen from Netgain. After the Data Breach in September 2020, Kalling experienced increased suspicious activity, receiving at least three notifications of credit card fraud. Kalling has had suspicious activity occur beyond his credit card that only one with his PII could unlock. Kalling has spent over thirty hours mitigating the damage to his credit as a result of the breach.

13.    Defendant Netgain Technology, LLC is a limited liability company (foreign) that provides cloud-based IT services. Netgain advertises itself as an expert in HIPPA compliance and cybersecurity as part of its services. Netgain Technology, LLC's principal place of business is 720 W Saint Germain Str, St. Cloud, Minnesota 56301 and is incorporated in Delaware.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d)(2) ("CAFA"), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

15.     The Court has personal jurisdiction over Defendant because Netgain's principal place of business is located in this District, its substantial business is conducted in this District, and Netgain has sufficient minimum contact with its affected business associates in this District. This Court has general and specific jurisdiction because Netgain has its corporate headquarters in Minnesota, which affiliates this forum to the underlying controversy that spans nationally. Netgain's affected clientele includes locations such as California, Nevada, South Carolina, and Washington. Netgain hosts data centers in Minnesota, as well as Illinois, Arizona, and California. Due to Netgain's extensive nationwide contacts, and its principal place of business in Minnesota, litigating in Netgain's principal place of business would be most convenient for Netgain.

16.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant maintains its principal place of business in this District and therefore resides in this District pursuant to 28 U.S.C. § 1391(c)(2). A substantial part of the events or omissions giving rise to the Class's claims also occurred in this District.

## STATEMENT OF FACTS

**A.    Netgain Presented Itself as a Cybersecurity Expert, But Failed to Maintain Reasonable and Adequate Security Measures to Safeguard Patients' Private Information**

17.    Netgain, a third-party cloud services provider, contracts with healthcare providers around the country. Netgain stores a vast amount of personally identifiable information ("PII") as part of its business model. Netgain presents itself as a cybersecurity, healthcare IT expert, captured in the company motto of "Secure. Specialized. IT." As part of their businesses, Defendant was entrusted with, and obligated to safeguard and protect PII of Plaintiff and the Class in accordance with all applicable laws.

18.    The Data Breach occurred as early as September 23, 2020.  It was not until December 3, 2020 that Netgain notified its clients of the Data Breach.

19.    In January 2021, Netgain confirmed Plaintiff's information was part of the ransomware attack whereby an unauthorized party gained access to PII including social security numbers, dates of birth, full or partial name, patient biometric data, telephone numbers, mailing and billing addresses, email addresses, patient and record identifiers, information relating to [patient] treatment (including billing and diagnosis codes, and the dates and locations of [patient] treatment), information contained within [patient] state-issued photo identification (including driver's license number, organ donor status, and appearance), and insurance cards containing [patient] name and/or beneficiary number.

20.    Upon learning of the Data Breach in November 2020, Netgain confirmed the extent of PII that was compromised starting in September. In late February 2021, five

months after the first Data Breach incursion, Netgain distributed template messaging for healthcare providers to notify their patients. Standard Netgain notification messaging was shared in at least four other client data breach notification letters.

21.     Netgain's website home page advertises itself as "the industry standard for secure and scalable IT-as-a-Service (ITaaS) for accounting and healthcare." Netgain also advertises itself as a provider of cybersecurity services, healthcare IT services, and after the Data Breach positions itself as an IT Security leader by publishing blogs such as "IT Security Trends for Second Half of 2021."[3]

### B.    Plaintiff and Class Members Suffered Damages

22.     Despite holding itself out as holding expertise in cyber security, Netgain did not take basic security measures for patient PII, like enabling international geo-fencing for local healthcare providers, until after the ransomware attack. Even after consulting an external cybersecurity firm Netgain offered no credit monitoring nor any resolution for affected patients.

23.     On February 24, 2021, Mark Kalling, received a notification letter with Netgain messaging. The letter stated Kalling's stolen information included:

> "full or partial: first and last names, dates of birth, billing information, social security numbers, telephone numbers, mailing and billing addresses, email addresses, patient and record identifiers, information relating to [patient] treatment (including billing and diagnosis codes, and the dates and locations of [patient] treatment), information contained within [patient] state-issued photo identification (including biometric information such as [patient] height, weight, driver's license number, organ donor status, and appearance), and insurance cards containing [patient] name and/or beneficiary number."

---

[3] Netgain Technologies, IT Security Trends for Second Half of 2021, https://www.netgainit.com/blog-it-security-trends-for-second-half-of-2021/

Kalling, a patient, was unfamiliar with Netgain's role as a business associate of his healthcare provider.

24.     The Notice Letter advised Kalling "to be vigilant in monitoring [his] account statements, credit reports, and explanation of benefit forms." The notification burdened patients to "place a fraud alert on your credit report" and if patients noticed suspicious activity to contact one of the three major credit reporting bureaus or the Federal Trade Commission.

25.     After the Data Breach notification, Kalling experienced increased suspicious activity, spending at least thirty hours trying to mitigate losing value of his PII.[4] Kalling received at least three notifications of credit card fraud.  Since the beginning of 2021, Kalling has had to close credit card accounts and reopen new ones. As a result, he also received notifications from his Discover card that his social security number is on the dark web. Discover later targeted ads to him to solicit $15 a month from him for advanced identity protection. Kalling's credit score dropped 100 points after the breach, requiring him to obtain a guarantor to rent housing. Kalling has had suspicious activity occur beyond his credit card that only one with his PII could unlock. His energy company cancelled his power utilities without explanation and without his consent, but a social

---

[4] Comparatively, the U.S. Department of Justice estimates identity theft victims spend an "average of about 7 hours clearing up issues." *See Victims of Identity Theft*, U.S. Dept. of Justice, Nov. 13, 2017, *available at* http://www.bjs. gov/content/pub/pdf/vit14.pdf (last visited June 4, 2021).

security number was required to cancel. The value of Kalling's PII has significantly decreased since the date of the Data Breach.

26.     Netgain's messaging offered publicly available information for the Federal Trade Commission and three Credit Bureaus, burdening Plaintiff with resolving compromised PII. Due to Netgain's lack of action, Plaintiff and Class members experienced loss of value of PII and benefit of bargain damages.

27.     Kalling obtained services from Defendant assuming he would receive the benefit of the bargain in adequate data security of his health information. Yet healthcare providers continue to relegate data security responsibilities to Netgain after Netgain's breach without confirming to patients whether patient information will be protected in the future.

28.     If Kalling was told that Netgain, his healthcare provider's business associate, failed to maintain adequate computer systems and basic data security practices to safeguard his PII from a ransomware attack, Kalling would have obtained medical services elsewhere.

**C.    Defendant Failed to Remedy Harm to Individual Patients from Data Breach**

29.     Both prior to and after the breach, Netgain advertised on its respective websites as HIPPA compliant.

30.     Netgain has yet to affirmatively notify impacted patients individually regarding which specific data was stolen.

31.     The Data Breach occurred because Netgain failed to take reasonable measures to protect the PII collected. Netgain failed to implement data security measures

designed to prevent this common attack, despite repeated warnings to the healthcare industry about cyberattack risks and the highly publicized occurrence of many similar ransomware attacks in the recent past on other healthcare providers. For example, Netgain did not previously block identified malicious IP addresses, restrict access rights for privileged accounts, or establish strong access management policies. Additionally, Netgain's irresponsibility extended to other healthcare providers with simple steps like failing to destroy legacy data on old servers[5] and paying the attacker.[6] Instead of providing specific help to Data Breach victims, Netgain offered only how they would improve their business. In turn, the only Netgain contact provided to class members was Netgain's website home page. The home page mentioned nothing of the breach. Netgain failed to disclose to Plaintiff and Class members the material fact that it did not have adequate data security practices to safeguard patients' personal data, and falsely represented that their security measures were sufficient to protect the PII in its possession.

32.    Netgain's failure to provide specific resolution of the Breach to Plaintiffs and Class members exacerbated the injuries resulting from the Breach.

---

[5] Caravus Data Breach Notification. https://media.dojmt.gov/wp-content/uploads/caravus-notif.pdf

[6] Neighborhood Healthcare Data Breach Notification. https://media.dojmt.gov/wp-content/uploads/Neighbor-Notif.pdf

**D.** **The Healthcare Industry is the Top Target for Cyber Criminals, and Netgain Failed to Comply with Existing Industry Standards**

33.     Ransomware attacks have been a well-known risk for healthcare providers for over a decade.

34.     In 2020, the Ponemon Institute, one of the leading experts in cybersecurity research, released that the Healthcare industry was the most lucrative target for Data Breaches.[7]

35.     The National Institute of Standards & Technology ("NIST") and HIPPA have both had their frameworks readily available, as advertised by the Department of Health and Human Services as a NIST-HIPPA crosswalk framework[8] since before 2016, to follow cybersecurity best practices for healthcare providers that included asset management, access control, and detection processes, as well as other steps that Netgain took after the data breach, rather than before.

36.     Patients signed a HIPPA acknowledgement while Netgain was not complying with the recommended HIPPA-NIST cybersecurity framework.

---

[7] IBM, *How Much Would a Data Breach Cost Your Business?*
https://www.ibm.com/security/data-breach

[8] HHS, *Addressing Gaps in Cybersecurity: OCR Releases Crosswalk Between HIPAA Security Rule and NIST Cybersecurity Framework* (Last reviewed February 23, 2016).
https://www.hhs.gov/sites/default/files/nist-csf-to-hipaa-security-rule-crosswalk-02-22-2016-final.pdf.

## CLASS ACTION ALLEGATIONS

37.     Plaintiffs bring all counts, as set forth below, individually and as a class action, pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure, on behalf of a Nationwide Class defined as:

> All persons who submitted their Private Information to Netgain or Netgain's associates and whose Private Information was compromised as a result of the data breach discovered in or about September 2020 (the "Nationwide Class").

38.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

39.     ***Numerosity***—Federal Rule of Civil Procedure 23(a)(1). The members of the Class are so numerous that joinder of all Class members would be impracticable. On information and belief, the Nationwide Class numbers in the tens of thousands.

40.     ***Commonality and Predominance***—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3). Common questions of law and fact exist as to all members of the Class and predominant over questions affecting only individual members of the Class. Such common questions of law or fact include, *inter alia*:

    a.     Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations including, *e.g.,* HIPAA;

    b.     Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

c.   Whether Defendant's properly implemented their purported security measures or their associate's purported security measures to protect Plaintiffs' and the Class's Private Information from unauthorized capture, dissemination, and misuse;

d.   Whether Defendant's took reasonable measures to determine the extent of the Data Breach after they first learned of same;

e.   Whether Defendant disclosed Plaintiff's and the Class's Private Information in violation of the understanding that the Private Information was being disclosed in confidence and should be maintained;

f.   Whether Defendant's conduct constitutes breach of an implied contract;

g.   Whether Defendant willfully, recklessly, or negligently failed to maintain and execute reasonable procedures designed to prevent unauthorized access to Plaintiffs' and the Class's Private Information;

h.   Whether Defendant was negligent in failing to properly secure and protect Plaintiffs' and the Class's Private Information;

i.   Whether Defendant was unjustly enriched by its actions; and

j.   Whether Plaintiff and the other members of the Class are entitled to damages, injunctive relief, or other equitable relief, and the measure of such damages and relief. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of himself and other members of the Class. Similar or identical common law violations, business practices, and injuries are involved. Individual questions, if any,

pale by comparison, in both quality and quantity, to the numerous common

questions that predominate in this action.

41.    *Typicality*—Federal Rule of Civil Procedure 23(a)(3). Plaintiffs' claims are

typical of the claims of the other members of the Class, because among other things, all

Class members were similarly injured through Defendant's uniform misconduct

described above and were thus all subject to the Data Breach alleged herein. Further,

there are no defenses available to Defendant that are unique to Plaintiffs.

42.    *Adequacy of Representation*—Federal Rule of Civil Procedure 23(a)(4).

Plaintiff is an adequate representative of the Nationwide Class because his interests do

not conflict with the interests of the Classes they seek to represent, they have retained

counsel competent and experienced in complex class action litigation, and Plaintiffs will

prosecute this action vigorously. The Class's interests will be fairly and adequately

protected by Plaintiffs and their counsel.

43.    *Injunctive Relief*—Federal Rule of Civil Procedure 23(b)(2). Defendant

has acted and/or refused to act on grounds that apply generally to the Class, making

injunctive and/or declaratory relief appropriate with respect to the Class under Fed. Civ.

P. 23 (b)(2).

44.    *Superiority*—Federal Rule of Civil Procedure 23(b)(3). A class action is

superior to any other available means for the fair and efficient adjudication of this

controversy, and no unusual difficulties are likely to be encountered in the management

of this class action. The damages or other financial detriment suffered by Plaintiffs and

the other members of the Class are relatively small compared to the burden and expense

that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Class to individually seek redress for Defendant's wrongful conduct. Even if members of the Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
**Negligence**

45.    Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

46.    Netgain owed numerous duties to Plaintiff and the Class, including the following:

a.    to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting PII in their possession;

b.    to protect PII using reasonable and adequate security procedures, systems, and resolutions that are compliant with industry-standard practices;

c.    not to subject Plaintiff and the Class's PII to an unreasonable risk of exposure and theft because Plaintiff and Class were foreseeable and probable victims of any inadequate security practices.

d.      to use reasonable security measures arose as a result of the special relationship that existed between Netgain and patients, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law.

47.     Upon Netgain accepting and storing the Private Information of Plaintiffs and the Class in their computer systems and on their networks, Netgain undertook and owed a heightened duty to Plaintiffs and the Class to exercise reasonable care to secure and safeguard that information and to use commercially reasonable methods to do so. Netgain knew that the PII was private and confidential and should be protected as private and confidential. Netgain's storage of Plaintiff's PII after Plaintiff's visit was not used to contribute to patients' medical treatment.

48.     Netgain's duty to use reasonable security measures under HIPAA required Netgain to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

49.     In addition, Netgain had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted, and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

50.     Netgain's violation of the FTC Act and state data security statutes constitutes negligence *per se* for purposes of establishing the duty and breach elements of Plaintiffs' negligence claim. Those statutes were designed to protect a group to which Plaintiffs belong and to prevent the type of harm that resulted from the Data Breach.

51.     State statutes requiring reasonable data security measures, including but not limited to Minn. R. 325E.61 requiring Defendant to "disclosure must be made in the most expedient time possible and without unreasonable delay" as well as notifying all consumer reporting agencies.

52.     Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because cybersecurity and healthcare industry standards bound Netgain to protect confidential PII.

53.     Netgain's own conduct also created a foreseeable risk of harm to Plaintiffs and Class members and their PII. Netgain's misconduct included failing to: (1) secure Plaintiffs' and Class members' PII; (2) comply with industry standard security practices; (3) implement adequate system and event monitoring; (4) respond to security alerts in a timely manner and (5) implement the systems, policies, and procedures necessary to prevent this type of data breach. Defendant was in a special position, with Netgain as an advertised cybersecurity expert, to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class members from a data breach.

54.     Netgain breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class members' PII. The specific negligent acts and omissions committed by Netgain include, but are not limited to, the following:

17

a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class members' PII;

b.  Failing to adequately monitor the security of Netgain's networks and systems;

c.  Allowing unauthorized access to Class members' PII;

d.  Failing to resolve in a timely manner that Class members' PII had been compromised; and

e.  Failing to offer a protection to Class members to mitigate the potential for identity theft and other damages.

But for Netgain's breach of duties, consumers' PII would not have been stolen.

55.  Through Netgain's acts and omissions described in this Complaint, including their failure to provide adequate security and their failure to protect Plaintiffs' and Class members' PII from being foreseeably captured, accessed, disseminated, stolen and misused, Netgain unlawfully breached their duty to use reasonable care to adequately protect and secure Plaintiffs' and Class members' PII during the time it was within Defendant's possession or control.

56.  Netgain's conduct was grossly negligent and departed from all reasonable standards of care, including, but not limited to, failing to adequately protect the PII.

57.  Plaintiffs and Class members had no ability to protect their PII once it was in Netgain's possession and control. Netgain was in an exclusive position to protect against the harm suffered by Plaintiffs and Class members as a result of the Data Breach.

58.     Neither Plaintiff nor the other Class members contributed to the Data

Breach and subsequent misuse of their Private Information as described in this

Complaint.

59.     There is a temporal and close causal connection between Netgain's failure

to implement adequate data security measures, the Data Breach, and the harms suffered

by Plaintiffs and Class members.

60.     Plaintiffs and Class members are also entitled to injunctive relief requiring

Netgain to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii)

submit to future annual audits of those systems and monitoring procedures; and (iii)

immediately provide free credit monitoring and compensation for harm to all Class

members.

## COUNT II
## BREACH OF CONTRACT

61.     Plaintiff fully incorporates by reference all of the above paragraphs, as

though fully set forth herein.

62.     Netgain entered into an express agreement as business associates with

healthcare providers, including Nevada Orthopedic & Spine Center. Patients, including

Plaintiff, were intended beneficiaries in these agreements, as assumed through promise of

compliance with HIPPA and industry standards. Plaintiff and Class members justifiably

relied on Netgain's promise to protect Plaintiff and Class member's PII.

63.     As detailed above, Netgain has a contractual obligation to maintain the

security of patients' personal, health, and financial information, which Plaintiff's

healthcare provider recognizes in its Notice of Privacy Practices where it addresses, "All of our business associates are obligated to protect the privacy of your information and abide by the same HIPAA Privacy standards as outlined in this Notice of Privacy Practice." The Notice of Privacy Practice "also describes [patient] rights to access and control your protected health information." Patient's lost control of their data once the Data Breach occurred.

64.    In consideration of Plaintiff's agreement to entrust Defendant with PII, Defendant expressly and/or implicitly agreed to reasonably protect Plaintiff's sensitive personal data and confidential health information as detailed above.

65.    The privacy policy also specifically promised the patient that PII did not include dissemination of Personal Information to third-parties as insecure.

66.    Defendant breached these contractual obligations by failing to safeguard and protect the PII of Plaintiff and Class members, including through the dissemination of PII through unsecured third-party communication and through PII disclosure, including personal, health, and financial information, to unsecure third-party business associates like Netgain.

67.    Netgain solicited Plaintiffs' sensitive personal data and confidential health information with the express and/or implied understanding that Netgain would safeguard said information from unauthorized cyber-attacks.

68.    Plaintiff reasonably believed and expected, in entering said agreements, that Netgain's data security policies, practices and controls would comply with industry standards and applicable laws and regulations, including HIPAA.

69. At all relevant times, Plaintiff fully performed his respective obligations under the parties' agreements.

70. Netgain also breached its contractual obligations by failing to mitigate or resolve patient's personal, health, and/or financial information that was compromised in and as a result of the Breach.

71. The acts and omissions of Netgain constitute a breach of said express and/or implied agreements, all to the damage and pecuniary detriment of Plaintiff without any breach on the part of Plaintiff.

72. The losses and damages sustained by Plaintiff and Class members as described herein were the direct and proximate result of the breaches of the contracts between Defendant and Plaintiff and members of the Class.

73. As a direct and proximate result of the foregoing, Plaintiff and the Class Members have been injured are entitled to damages in an amount to be determined at trial, including, but not limited to, damages via benefit of the bargain, monetary damages and expenses for identity theft protection services and credit monitoring, periodic credit reports, decreased credit score and resulting harm, loss of time, anxiety, emotional distress, loss of privacy and other ordinary, loss of value, incidental and consequential damages as would be anticipated to arise under the circumstances.

74. Plaintiff further seek declaratory and injunctive relief: (1) compelling a security audit of Defendant's electronic computer systems; (2) compelling Defendant to provide Plaintiff and Class members with identity theft protection services and credit monitoring; and (3) compelling Defendant to implement adequate data security

safeguards to protect plaintiffs and the class' Personal and Health Information and to undergo future data security audits.

## COUNT III
## BREACH OF IMPLIED CONTRACT

75.     Plaintiff re-alleges and incorporate by reference all preceding allegations as if fully set forth herein.

76.     When Plaintiff and Class members provided consideration and PII to Defendant in exchange for medical treatment, they entered implied contracts with Defendant under which Defendant agreed to adopt reasonable safeguards complying with relevant laws, regulations, and industry practices, including HIPPA, to protect their PII.

77.     Plaintiffs and Class members were required to provide their PII as a condition of the medical treatment.

78.     When entering implied contracts, Plaintiff and Class members reasonably believed and expected that Defendant would implement reasonable data security measures and that Defendant's data security practices complied with relevant laws, regulations, and industry standards. Defendant knew or should have known that Plaintiff and Class members held this belief and expectation.

79.     Class members who paid money or authorized insurance payments to healthcare provider reasonably believed and expected their business associates would use part of those funds to obtain adequate data security during treatment. As a business associate, Netgain failed to do so.

80.     When entering the implied contracts, Defendant impliedly promised to adopt reasonable data security measures. Netgain required taking patient PII for patients to receive medical treatment. In accepting PII, Defendant made implied or implicit promises that its data security practices were reasonably sufficient to protect consumers' PII.

81.     Defendant's conduct in requiring patients to provide PII as a prerequisite to their medical treatment illustrates Netgain's intent to be bound by an implied promise to adopt reasonable data security measures.

82.     Plaintiff and Class members would not have provided their PII to Defendant in the absence of Defendant's implied promise to keep the PII reasonably secure.

83.     Plaintiff and Class members fully performed their obligations under their implied contracts with Defendant. They provided consideration and their PII to Defendant in exchange for medical services and Defendant's implied promise to adopt reasonable data security measures.

84.     Netgain breached the implied contract with Plaintiff and Class members by failing to implement reasonable data security measures.

85.     As a result of Netgain's conduct, Plaintiff and Class members have suffered, and continue to suffer, legally cognizable damages set forth herein, including nominal damages.

86.     Plaintiff and Class members are entitled to all forms of monetary compensation and injunctive relief set forth herein.

87.    As a direct and proximate result of Netgain's breaches of the implied contracts between Netgain, Plaintiff and Class members, the Plaintiff and Class members sustained actual losses and damages as described in detail above.

88.    Plaintiff and Class members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide free credit monitoring to all Class members.

**COUNT IV**
**UNJUST ENRICHMENT / QUASI-CONTRACT**

89.    Plaintiff and Class members re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

90.    This claim is pled in the alternative to Plaintiff's breach of implied contract claim.

91.    Plaintiff and Class members conferred benefits upon Netgain.

92.    In exchange for providing payment and PII, Plaintiff and Class members should have received medical treatment accompanied by Defendant's adequate safeguarding of their PII.

93.    Netgain knew that Plaintiff and Class members conferred a benefit on it and accepted, has accepted, or retained that benefit. Netgain profited from Plaintiffs' payments and used Plaintiffs' and Class members' Private Information for business or business associate purposes. Netgain had enough revenue to pay attackers. Yet, Netgain still did not compensate the victims of the Data Breach.

94.     Netgain's business associate contract with Plaintiff's healthcare provider created Plaintiff and Class members into an implied third-party beneficiary.

95.     Netgain failed to secure Plaintiffs' and Class members' PII and, therefore, did not provide full compensation for the benefit the Plaintiffs' and Class members' PII provided.

96.     Netgain acquired the PII through inequitable means as they failed to disclose the inadequate security practices previously alleged.

97.     If Plaintiff and Class members knew that Netgain would not secure their PII using adequate security, they would not have made transactions with Defendant.

98.     Under the circumstances, it would be unjust for Netgain to be permitted to retain

99.     any of the benefits that Plaintiff and Class members conferred on them.

100.    Under principles of equity and good conscience, Netgain should not be permitted to retain the full monetary benefit of its transactions with Plaintiffs and Class members. Netgain failed to adequately secure consumers' PII and, therefore, did not provide the full services that patient paid for. Patients now must monitor their personal, immutable PII for the rest of their lives.

101.    If Plaintiffs and Class members would have known that Netgain employed inadequate data security safeguards, they would not have agreed to providing Defendant with PII.

102.    As a direct and proximate result of Netgain's conduct, Plaintiffs and Class members have suffered the various types of damages alleged herein.

103.    Class members have no adequate remedy at law. Netgain continues to

retain Class members' PII, and similar data security practices and vendors while exposing

the PII to a risk of future data breaches in Defendant's possession.

104.    Netgain should be compelled to disgorge into a common fund or

constructive trust, for the benefit of Plaintiffs and Class members, proceeds that they

unjustly received from them. In the alternative, Defendant should be compelled to refund

the amounts that Plaintiffs and Class members overpaid.

## COUNT V
### VIOLATION OF THE MINNESOTA CONSUMER PROTECTION STATUTE ON DECEPTIVE TRADE PRACTICES Section 325D.44 and DATA WAREHOUSES Section 325E.61 Subdivision 1
### (On Behalf of the Nationwide Class)

105.    Plaintiffs re-allege and incorporate by reference all preceding allegations as

if fully set forth herein.

106.    The consumer protection statute Minn. R. 325D.44 describes a deceptive

trade practice as when in course of business the person "(1) passes off goods or services

as those of another;" or "(3) causes likelihood of confusion or of misunderstanding as to

affiliation, connection, or association with, or certification by, another;" or "(7)

represents that goods or services are of a particular standard, quality, or grade, or that

goods are of a particular style or model, if they are of another."

107.    Netgain represented itself as an expert in providing healthcare services

compliant with particular industry standards relating to both healthcare IT and

cybersecurity. However, once a common ransomware attack fractured Netgain's systems, Netgain hired additional outside cybersecurity firm aid.

108.    Netgain passed off its services as secure through representations in Netgain's template data breach notification messaging and Netgain's website. But Plaintiff experienced confusion when receiving a breach notification from his healthcare provider that mentioned Netgain. Plaintiff had no prior knowledge of his healthcare provider's affiliation to Netgain as a named business associate nor an understanding that his privacy was at risk from a third-party business associate.

109.    The consumer protection statute Minn. R. 325E.61 subd. 1 defines "personal information" to inclusive of social security number, driver's license number, and credit card number.

110.    Minn. R. 325E.61 subd. 1 also states:

"The disclosure must be made in the most expedient time possible and without unreasonable delay, consistent with the legitimate needs of law enforcement, as provided in paragraph (c), or with any measures necessary to determine the scope of the breach, identify the individuals affected, and restore the reasonable integrity of the data system."

111.    Netgain violated disclosure in the most expedient time possible when its initial breach occurred in September 2020, but they did not notify Plaintiff's healthcare provider until January 2021.

112.    Plaintiffs and Class members are also entitled to injunctive relief and an award of their attorney's fees and costs pursuant to this statute.

## COUNT VI
**Breach of Confidence**

113.   Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

114.   At all times during Plaintiff's and Class members' administrative medical interactions, Defendant was fully aware of the confidential, novel, and sensitive nature of Plaintiff's and Class members' PII that Plaintiff and Class members provided to Defendant.

115.   As alleged herein and above, Defendant's relationship with Plaintiff and Class members was governed by expectations that Plaintiff and Class members' PII would be collected, stored, and protected in confidence, and would not be disclosed to unsecure third parties.

116.   Plaintiff and Class members provided their respective PII with the implicit understandings that Defendant as a healthcare business associate would protect, use precaution, comply with basic principles of information security practices, and not permit the PII to be irresponsibly disseminated to any unsecure parties.

117.   Defendant voluntarily received in confidence Plaintiff's and Class members' PII with the understanding that the PII would not be disclosed or disseminated to the public or any unsecured third parties.

118.   Due to Defendant's failure to prevent, detect, and/or avoid the Data Breach from occurring by, inter alia, failing to follow best information security practices to secure Plaintiff's and Class members' PII, Plaintiff's and Class members' Private

Information was disclosed and misappropriated to unsecured third parties beyond Plaintiff's and Class members' confidence, and without their express permission.

119.    But for Defendant's disclosure of Plaintiff's and Class members' PII in violation of the parties' understanding of confidence, their PII would not have been compromised, stolen, viewed, accessed, and used by unsecured third parties. Defendant's Data Breach was the direct and legal cause of the theft of Plaintiff's and Class members' PII, as well as the resulting damages.

120.    The injury and harm Plaintiff and Class members suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiff's and Class members' PII. Defendant knew or should have known their security systems were insufficient to protect the PII that is coveted by thieves worldwide. Defendant also failed to observe industry standard information security practices.

121.    As a direct and proximate cause of Defendant's conduct, Plaintiffs and Class members suffered damages as alleged above.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully request the following relief:

(a)  An Order certifying this case as a class action;

(b)  An Order appointing Plaintiff as class representative;

(c)  An Order appointing the undersigned counsel as class counsel;

(d) An award of compensatory damages to Plaintiff, money for significant and reasonable identity protection services, statutory damages, treble damages, and damages;

(e) Injunctive relief requiring Defendant to, *e.g.*: (i) strengthen and adequately fund their data security systems and monitoring procedures; (ii) submit to future independent annual audits of those systems and monitoring procedures; (iii) implement encryption of sensitive PII in all databases for all clients; and (iii) immediately provide free credit monitoring to all Class members;

(f) An Order for Defendant to pay equitable relief, in the form of disgorgement and restitution, and injunctive relief as may be appropriate;

(g) An Order for Defendant to pay both pre- and post-judgment interest on any amounts awarded;

(h) An award of Plaintiff's attorneys' fees and litigation costs; and

(i) Such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Date: June 9, 2021                                  Respectfully submitted,

*s/David A. Goodwin*
Daniel E. Gustafson (#202241)
Amanda M. Williams (#341691)
David A. Goodwin (#386715)
Mickey L. Stevens (#398549)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402

Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
awilliams@gustafsongluek.com
dgoodwin@gustafsongluek.com
mstevens@gustafsongluek.com

Nicholas A. Migliaccio (*pro hac vice* anticipated)
Jason S. Rathod (*pro hac vice* anticipated)
**MIGLIACCIO & RATHOD LLP**
412 H Street NE
Washington, DC 20002
Tel: (202) 470-3520
Fax: (202) 800-2730
nmigliaccio@classlawdc.com
jrathod@classlawdc.com

***Counsel for Plaintiff***